UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

Juanita M Harris,                              :
                                               :
                        Plaintiff,             :
                                               :
            -against-                          :
                                               :
Kilolo Kijakazi,                               :
                        Defendant.             :
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/7/2023

**OPINION AND ORDER**
**22-CV-1214 (KHP)**

**KATHARINE H. PARKER, United States Magistrate Judge**.

Plaintiff Juanita Harris, represented by counsel, commenced this action against

Defendant, Kilolo Kijakazi, Acting Commissioner of the Social Security Administration ("SSA"),

pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of

Defendant's decision that she was not disabled under sections 216(i) and 223(d) of the Act, and

accordingly was not eligible to receive disability insurance benefits.  The parties both moved for

judgment on the pleadings.  (ECF No. 15 ("Joint Stip.").)  For the reasons set forth below, the

Court denies Plaintiff's motion, and grants Defendant's motion.

## BACKGROUND

Plaintiff is a 54-year-old woman with a high school education and a GED.

(Administrative Record ("A.R.") 111).  She lives alone in Mount Vernon, New York.  From 1995

until December 14, 2017, Plaintiff worked as a flight attendant.  (*Id.* at 125.)  On December 14,

2017, while on the job, Plaintiff was forcefully struck in the face by the handle of an airplane

door, causing Plaintiff to briefly lose consciousness and fracture her nose.  (*Id.* at 703.)

Following that incident, Plaintiff has suffered from post-concussional syndrome ("PCS"),[1]

headaches, Post Traumatic Stress Disorder ("PTSD"), depression, and anxiety.  (*Id*. at 442).

Plaintiff has not returned to work since the injury.  (*Id*. at 606.)

On May 6, 2019, Plaintiff applied for disability insurance benefits, alleging disability

beginning on December 14, 2017 – the date of the workplace injury.  (*Id*. at 131).  Her claims

were denied on July 24, 2019, and on reconsideration on August 29, 2019.  (*Id*.)  Following a

telephonic hearing, on June 19, 2020, administrative law judge ("ALJ") Kieran McCormack

issued a decision finding that Plaintiff was not entitled to disability benefits.  (*Id*. at 81, 128).

Plaintiff appealed that decision.

While Plaintiff's appeal was pending, on June 30, 2020, Plaintiff was diagnosed with

diabetes.  On December 10, 2020, the Appeals council remanded the claim and directed a new

hearing because, due to a technical issue at the first hearing, a significant portion of the hearing

transcript was not available, and because the ALJ's initial decision was internally inconsistent to

the extent it found persuasive the opinion of Dr. Melissa Antiaris but did not adopt any

limitations in accordance with that opinion.  (*Id*. at 152).

On April 13, 2021, the ALJ held another hearing and on June 29, 2021, he again found

that Plaintiff was not entitled to disability benefits.  Plaintiff filed this action on February 11,

2022, seeking reconsideration of the decision.

---

[1]  Postconcussional syndrome, also called post-concussion syndrome or post-concussion disorder, occurs "when symptoms of a mild traumatic brain injury last longer than expected after an injury. These symptoms may include headaches, dizziness, and problems with concentration and memory."  Persistent post-concussive symptoms (Jan 18, 2023), *available at* https://perma.cc/HFA5-X6SK.

1. **Relevant Medical History**

    a. **Treating Providers**

        i. **New York-Presbyterian Lawrence Hospital**

On December 15, 2017, the day following Plaintiff's workplace injury, Plaintiff visited the New York-Presbyterian ("NYP") Lawrence Hospital emergency room with complaints of mild swelling to the nose, headache, and lightheadedness. (*Id*. at 627-30.) Plaintiff reported "no back pain, joint pain, joint swelling, [or] muscle weakness." (*Id.* at 627.) A physical exam revealed limited range of motion in Plaintiff's neck, full ranges of motion in the extremities, no swelling, no tenderness, and normal motor activity. (*Id*. at 628.) Attending radiologist, Dr. Serena Mak, M.D., diagnosed a mild depression of the right nasal bone without appreciable fracture and minimal focal buckling of the left anterior nasal bone. (*Id.* at 625-26.) Dr. Mak assessed that per head injury guidelines, emergent imaging of the head was not indicated. (*Id.* at 630.) Plaintiff was given Tylenol for her facial pain. (*Id.*)

On January 19, 2018, Plaintiff underwent a computerized tomography ("CT") scan of her head to assess for damage. (*Id*. at 553.) The results were unremarkable. (*Id.*)

On January 25, 2018, plastic surgeon Dr. Sergei Kaslow, M.D., performed a closed nasal bone reduction and splint placement to correct the nasal bone fracture and improve a small deformity on Plaintiff's nasal roof as a result of the workplace injury. (*Id.* at 631.) Dr. Kaslow noted that there were no complications from the surgery. (*Id.* at 632.)

On October 24, 2019, Plaintiff reported to NYP Lawrence emergency room with complaints of chest pain and panic symptoms. (*Id.* at 725.) She was involuntarily transferred to the psychiatric unit at NYP in White Plains and was discharged on November 1, 2019. (*Id.*)

On June 30, 2020, Plaintiff returned to the NYP Lawrence emergency room complaining of weakness, dizziness, and increased urination and thirst.  (*Id.* at 793.)  Plaintiff was diagnosed as diabetic and as experiencing hyperosmolar hyperglycemic syndrome ("HHS"), which is a complication of diabetes.[2]  (*Id.* at 797-99.)  The attending physician also noted diagnoses of hypertension and depression.  Plaintiff was prescribed insulin medications to manage her diabetes mellitus and remained in the Intensive Care Unit until July 3, 2020.  (*Id*.)

Plaintiff returned to NYP Lawrence emergency room on July 6, 2020 due to facial swelling.  (*Id.* at 808.)  The attending physician found no significant facial swelling on exam and advised Plaintiff to follow up with an endocrinologist.  (*Id.*)

On December 5, 2020, Plaintiff returned to NYP Lawrence complaining of high blood pressure.  She underwent an electrocardiogram ("EKG").  (*Id*. at 917, 934.)  Plaintiff returned on several dates in December 2020 with reports of palpitations after she took insulin for her diabetes.  She underwent additional EKGs, a chest radiograph, and cardiac consultations.  (*Id.* at 848-954, 960, 976-85).  Plaintiff's physical exams during this period were normal.  (*Id.*)

### ii.  Manhattan Internal Med

On April 25, 2018, Plaintiff visited Manhattan Internal Med, a medical clinic in New York City, and reported dizziness and headaches.  (*Id.* at 543.)  At a visit on July 22, 2019, Plaintiff denied headaches, dizziness, anxiety, or depression.  (*Id.* at 547.)  Dr. Ashima Bakhru examined Plaintiff and noted that Plaintiff "needs distraction due to facial fracture and [hypertension]," as well as a referral for pain management.  (*Id.* at 548.)

---

[2]  *Hyperosmolar Hyperglycemic State (HHS)*, Cleveland Clinic, *available at* https://perma.cc/7AVX-9QDH.

### iii.  Michael Hargrove, M.D.

Plaintiff has received regular psychological treatment from psychiatrist Dr. Michael Hargrove, M.D. for Attention Deficit Disorder ("ADD") and anxiety since 2010.  Since 2010, Plaintiff has visited Dr. Hargrove monthly and received prescriptions for ADD medication.  In the period following Plaintiff's workplace injury, Plaintiff frequently reported to Dr. Hargrove that she was feeling stressed, overwhelmed, and depressed.  (*Id.* at 742-44, 747-48.)  Plaintiff also reported weight loss and difficulty sleeping but denied hallucinations or suicidal ideation.  (*Id.*)

### iv.  Behavioral Medicine Associates

On August 8, 2018, Plaintiff began receiving treatment from Behavioral Medicine Associates, a group that assists individuals in dealing with the psychological consequences of an injury.  (*Id*. at 570.)  Plaintiff was primarily treated by Dr. Christene Roufail, Psy.D., a clinical psychologist.  (*Id.*)  At her initial intake, Plaintiff reported that since her workplace injury, she experienced recurrent headaches, dizziness, numbness, cognitive difficulties, clumsiness, loss of balance, irritability, fatigue, mood swings, crying spells, decreased motivation, and changes to her appetite and sleep patterns.  (*Id.*)  Plaintiff also reported becoming more argumentative, giving up on her hobbies, and struggling with simple tasks such as cleaning and doing laundry.  (*Id.*)  Dr. Roufail noted that Plaintiff was pleasant and cooperative with normal speech; was alert and oriented to time, place, and self; had a sad/depressed mood and affect; and showed impaired memory, concentration, and attention.  (*Id.*)  On a psychological assessment, Plaintiff presented in the moderate range on the Beck Depression Inventory and the severe range on the Beck Anxiety Inventory.

Dr. Roufail placed Plaintiff on a program of psychological pain-stress management with a focus on exercise, relaxation, task-persistence, coping self-statements, and social support. (*Id*. at 573.)  She subsequently added a program of cognitive rehabilitation to Plaintiff's care plan.  She diagnosed Plaintiff with major depressive disorder, single episode, severe without psychotic features; pain disorder with related psychological factors; and PCS.  (*Id*.)

After her initial intake, Plaintiff returned for treatment with Dr. Roufail twice a week and underwent several psychological evaluations.  Plaintiff typically arrived on time, but occasionally arrived late for these appointments.  (*See id.* at 755, 763.)

On August 26, 2018, Dr. Roufail and Dr. Krystal Salandanan, Psy.D. conducted a psychological evaluation.  They found that Plaintiff was pleasant and cooperative with a sad/depressed mood, and a "circumstantial and tangential" thought process.  (*Id.* at 633.)  Plaintiff denied suicidal ideation and there was no evidence of a thought disorder.  (*Id.*)

On September 19, 2018, Dr. Roufail and Dr. Elina Spektor, Ph.D. performed a neurocognitive evaluation.  (*Id.* at 660.)  Plaintiff scored in the low range on the neurocognitive index, indicating cognitive impairment.  She scored in the low to very low range for composite memory, verbal and visual memory, complex and simple attention, cognitive flexibility, and executive function.  (*Id.*)  Plaintiff received average scores on psychomotor speed, processing speed, and motor speed.  (*Id.*)

On June 19, 2019, Dr. Roufail conducted a reevaluation of Plaintiff's psychological and cognitive symptoms.  (*Id.* at 765.)  On a mental status exam, Plaintiff was pleasant and cooperative, but tearful with a sad and worried mood.  (*Id.*)  Plaintiff reported passive suicidal ideation and indicated ongoing difficulties with expressive/receptive language, executive

6

functioning, distractibility, sensorium, and memory.  (*Id.* at 766.)  A nonbehavioral status exam indicated "ongoing areas of cognitive impairment," but Plaintiff's intellectual functioning was in the average range and her concentration, memory, and crystallized intelligence were intact. (*Id.*)  The psychological assessment indicated severe depression and anxiety, significant distress, and very low overall satisfaction with life.  (*Id.* at 766-67.)  Plaintiff indicated extreme unhappiness, lack of fulfilment, self-criticism, self-blame, and preoccupation with danger.  (*Id.* at 768.)  Dr. Roufail determined that Plaintiff had not yet reached maximum medical improvement and that further gains were possible with consistent treatment.  (*Id.* at 769.)

At a July 9, 2019, visit for cognitive rehabilitation treatment, Dr. Roufail assessed Plaintiff's cognitive skill level as "Below Normal Limits."  (*Id.* at 708.)  Dr. Roufail noted that Plaintiff "performed consistently well on the Processing Speed and Verbal/Visual Memory tasks," and performed "inconsistently on the Auditory, Executive Functions, and Visual/Spatial Abilities tasks."  (*Id.*)  Dr. Roufail found Plaintiff to be "self-sufficient, yet distractible."  (*Id.*)

At a July 16, 2019, visit, Plaintiff reported experiencing sadness and crying spells.  (*Id.* at 710.)  Notes from subsequent sessions indicate Plaintiff made progress in various areas of cognitive functioning, but she also regressed in certain areas as she reached higher levels.  (*Id.* at 712-22, 731, 733-36, 754, 756, 760.)  On October 1, 2019, and at subsequent visits, Plaintiff reported feeling disappointed and worried that her recovery was taking longer than expected. (*Id.* at 722-24, 732, 739.)

On October 24, 2019, Plaintiff attended her session virtually from the NYP psychiatric unit, where she was being held after reporting to the emergency room due to chest pain and panic symptoms.  (*Id.* at 725.)  At the November 8, 2019 session, she processed the events

leading up to her hospitalization with Dr. Roufail.  (*Id.* at 727.)  Plaintiff was prescribed

Clonazepam, which is typically prescribed for panic disorders.  (*Id.*)

On May 3, 2020, Dr. Roufail conducted a psychological re-evaluation.  (*Id.* at 785.)

Plaintiff presented with "motor retardation" and "walked slower due to imbalance."  (*Id.*)  She

endorsed chronic pain, sleep disturbance, decreased appetite, and feelings of worthlessness.

(*Id.*)  The neurobehavioral exam continued to show areas of cognitive impairment, and Plaintiff

struggled to complete serial sevens and correctly identify the time.  On the psychological

assessment, Plaintiff continued to score in the severe range for depression and anxiety but

showed improvement regarding feelings of hopelessness.  (*Id.* at 786.)  Dr. Roufail assessed that

Plaintiff had not reached maximum medical improvement and opined that from a psychological

perspective, based on Plaintiff's symptoms, testing, and presentation, Plaintiff's degree of

disability was "temporary, marked (75%)."  (*Id.* at 788-89.)

### v.  Richard Radna, M.D.

On July 29, 2019, Plaintiff visited Dr. Richard Radna, M.D., a neurosurgery specialist, for

treatment of her neurological symptoms.  She reported persistent cephalalgia (i.e., headaches),

dizziness, light-headedness, lack of orientation, nausea, and vomiting, as well as difficulties with

memory, affairs of daily living, vision, hearing, and balance.  (*Id.* at 486.)  On a physical

evaluation, Plaintiff was fully oriented and "negative for any cognitive deficits."  (*Id.* at 847.)  Dr.

Radna identified impressions for cerebral concussion and PCS.  (*Id.*)  He assessed that Plaintiff's

medical impairment was 100% for purposes of worker's compensation and recommended

magnetic resonance imaging ("MRI") of Plaintiff's brain, along with further neurological and

neuropsychological care.  (*Id.*)

Plaintiff underwent an MRI on August 2, 2019, and returned for a follow-up appointment with Dr. Radna on August 5, 2019.  (*Id*. at 855).  Dr. Radna observed that the MRI showed signal changes within the medial temporal lobes consistent with cerebral contusion.[3] (*Id.* at 700.)  He again assessed medical impairment of 100% and referred Plaintiff for neuro-psychological management.  (*Id.*)  Dr. Radna saw Plaintiff again on April 12, 2021, and assessed that Plaintiff's PCS and associated cognitive deficits "have permanency" and caused "total disability."  (*Id.* at 866.)

### vi.  Rafael Abramov, D.O.

On September 9, 2019, Plaintiff visited pain management physician Rafael Abramov, D.O., for neuro-psychological management.  (*Id.* at 703.)  On physical examination, Plaintiff was alert and oriented, but appeared to be in distress and cried throughout the interview.  (*Id.*)  Dr. Abramov noted that Plaintiff was "intact" neurologically, her range of motion was within normal limits, and she could stand on her heels and toes.  (*Id.* at 703-04.)  Plaintiff presented with headaches and loss of balance as the result of PCS.  (*Id.* at 704.)  Dr. Abramov advised Plaintiff to avoid strenuous activities.  (*Id.*)  Plaintiff returned to Dr. Abramov on January 28 and March 16, 2020.  (*Id*. at 751-52, 835-40.)  At the March 16 visit, Plaintiff was "in distress" and crying.  (*Id.* at 751.)  Plaintiff had normal range of motion and 5/5 manual muscle strength.  (*Id.*) Dr. Abramov again counseled Plaintiff to avoid strenuous activities because they "may aggravate the injuries."  (*Id.* at 752.)

---

[3]  Cerebral contusions are scattered areas of bleeding on the surface of the brain, typically resulting from a head injury.  Outcomes vary according to factors such as the size of the contusion.  *Cerebral Contusion and Intracerebral Hematoma*, UCLA Health, *available at* https://perma.cc/S252-W9ZV.

**b.  Independent Medical Examinations**

**i.   William B. Head, Jr., M.D., P.C.**

On March 14, 2019, Plaintiff visited Dr. William B. Head, Jr., M.D., P.C., for an

independent psychiatric consultation.  (*Id.* at 604.)  Dr. Head reviewed the CT report from

January 2018, and noted that the report was normal, with no evidence of brain injury.  (*Id*. at

605.)  Following his examination of Plaintiff, Dr. Head reviewed additional medical records,

including psychotherapy progress notes from Behavioral Medicine Associates.  (*Id.* at 619.)

Plaintiff reported to Dr. Head that she was experiencing increased anxiety since her

injury due to persistent headaches and imbalance as well as a fear of running.  (*Id*. at 607.)  She

also reported suffering from regular nightmares, headaches, depression, dizziness, memory and

concentration impairment, weight loss, and blurred vision.  (*Id.* at 607-11.)  She reported

sleeping only about 4 or 5 hours a day.  (*Id*. at 610.)  She denied suicidal ideation or attempts.

(*Id.* at 612.)  Plaintiff reported that her medications include Adderall for ADD and migraines,

Prozac for depression, and Xanax to aid with sleep.  (*Id.* at 604.)

Plaintiff reported being close with her family but noted that she lives in a different state

from her siblings and mother.  (*Id.*)  She stated that she enjoys watching television and does

yoga or other floor-based exercise daily, and that prior to the accident, she also enjoyed

reading, writing, and cooking.  (*Id.* at 610-11.)  She reported that she struggles to do grocery

shopping because she does not like to be in open spaces and that she cannot take public

transportation alone, but she is able to drive.  (*Id*.)  She reported having a few friends, but that

she does not want to be around people and has difficulty sustaining friendships.  (*Id.*)  Plaintiff

also reported she had loved her job as a flight attendant, and she had received good reviews at work and was never criticized for absenteeism or lateness.  (*Id.* at 608.)

Dr. Head examined Plaintiff and did not find any impairment of concentration or comprehension, sign of brain injury, delusions, or hallucinations.  (*Id.* at 611-13.)  He assessed that Plaintiff was friendly with logical and coherent thinking, intact social judgment, and memory recall.  (*Id.* at 613.)  Based on his examination, Dr. Head concluded that Plaintiff had mild anxiety and mild depression, which he opined were unrelated to the workplace injury. (*Id.*)  He found that there was no evidence of major depression or other psychiatric disorder. (*Id.* at 616.)  He also diagnosed Plaintiff with PCS as a result of the injury, with symptoms of imbalance, headaches, and trouble with memory and concentration.  (*Id.* at 614-15.)  He opined that Plaintiff is not psychiatrically disabled and found no basis for psychiatric restrictions.  (*Id.*) He opined that Plaintiff could manage a desk job without further care, and that she should eventually be able to return to work as a flight attendant.  (*Id.*)

### ii. Industrial Medicine Associates: Melissa Antiaris, Psy.D. and Nina Spooner, M.D.

On June 20, 2019, Plaintiff visited Industrial Medicine Associates for an independent psychiatric evaluation.  (*Id.* at 664.)  She was examined by Dr. Melissa Antiaris, Psy.D.  Plaintiff drove herself to the appointment.  (*Id.*)  Plaintiff reported experiencing difficulty sleeping, loss of appetite, depression, fatigue/loss of energy, concentration difficulties, forgetfulness, and social withdrawal.  (*Id*.)  She also reported experiencing feelings of worthlessness, crying spells, bad social anxiety, and panic attacks.  (*Id.*)  Plaintiff reported feeling fearful about going back to work due to fear that something bad would happen and reported prior work-related traumatic

experiences, including flying on 9/11.  (*Id.* at 665.)  She denied any mania, thought disorders, or suicidal thoughts.  (*Id.*)  Plaintiff reported being able to dress, bathe, and groom herself; prepare simple meals; drive; do floor exercises; and manage her own funds.  (*Id.* at 666-67.)

Upon examination, Plaintiff was cooperative, related adequately, and had coherent and goal directed thought processes.  (*Id.* at 665-66.)  She had a mildly dysphoric affect and mildly dysthymic mood.  (*Id.* at 666.)  Her attention, concentration, and recent and remote memory skills were mildly impaired due to emotional distress during the exam.  (*Id.*)  Dr. Antiaris assessed Plaintiff's cognitive functioning to be in the average range and noted that her general fund of information was somewhat limited, and her insight and judgment were "fair."  (*Id.*)

Dr. Antiaris opined that Plaintiff was "markedly" limited in her abilities to regulate emotions, control behavior, and maintain well-being; "moderately" limited in her ability to use reason and judgment to make work-related decisions and to interact adequately with supervisors, coworkers, and the public; "mildly" limited in her ability to sustain concentration and perform a task at a consistent pace, to sustain ordinary routine and regular attendance at work, and to maintain personal hygiene and be aware of normal hazards; and not limited in her ability to understand, remember, or apply simple or complex directions and instructions.  (*Id.* at 667.)  She stated that Plaintiff's difficulties were caused by lack of motivation and may significantly interfere with her ability to function on a daily basis.  Dr. Antiaris diagnosed Plaintiff with PTSD and major depressive disorder and opined that Plaintiff's impairments would remain for more than one year.  (*Id.* at 668.)

On the same day, Plaintiff underwent a neurologic examination with Industrial Medicine Associates conducted by Dr. Nina Spooner, M.D.  (*Id.* at 670.)   Plaintiff reported that since her

workplace injury, she experienced non-radiating pressure-like pain in her forehead and behind her right eye that disrupts her sleep.  (*Id.*)  Plaintiff also reported experiencing discharge and blurring of the right eye and poor balance.  (*Id.*)  Dr. Spooner noted that Plaintiff has had hypertension since 2010.  (*Id.* at 670-71.)  Plaintiff did not need assistance changing or getting on and off the exam table.  (*Id.*)  She was dressed appropriately, maintained appropriate eye contact, appeared oriented to time, person, and place, and exhibited no evidence of delusions or hallucinations.  (*Id.*)  Dr. Spooner assessed that Plaintiff appeared "very anxious," and "cried through the whole examination."  (*Id.* at 672.)  Plaintiff's gait, station, and heel-to-toe tandem walk were normal, and her hand and finger dexterity were intact.  An examination of Plaintiff's spine, head, neck, cranial nerves, and eyes returned normal results.  Plaintiff had 5/5 strength in her upper and lower extremities and normal muscle tone.  A sensory exam showed that Plaintiff had normal sensation to pain, light touch, proprioception, and vibration.  (*Id.*)

Dr. Spooner diagnosed Plaintiff as "status post head injury" with chronic headaches, hypertension, depression, social anxiety, and ADD.  (*Id.* at 673.)  Dr. Spooner identified no exertional limitations, but opined that Plaintiff may experience schedule interruptions secondary to headaches.  (*Id.*)  She assessed that Plaintiff had a "fair" prognosis.  (*Id.*)

### c.  Non-Examining State Agency Consultants

On July 18, 2019, state agency medical consultant Dr. A. Saeed reviewed the record up until that date but did not examine Plaintiff.  He opined that Plaintiff's endorsed symptoms of headaches, sensitivity to light and sounds, and poor balance were consistent with the record but concluded that Plaintiff had no severe physical impairments and "no [e]xertional [l]imitations."  (*Id.* at 104-08).  On August 23, 2019, state agency medical consultant Dr. S.

13

Ahmed reviewed the evidence of record and affirmed Dr. Saeed's findings of no severe physical impairments and no exertional limitations." (*Id.* at 118-22.)

On July 18, 2019, state agency psychiatric consultant Dr. M. Juriga reviewed the evidence of record up until that date but did not examine Plaintiff. Dr. Juriga opined that Plaintiff was moderately limited in her abilities to interact with the public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (*Id.* at 109-10.) Dr. Juriga further opined that Plaintiff has moderate limitations in concentrating, persisting, or maintaining pace and mild limitations in understanding, remembering, or applying information. Dr. Juriga found that Plaintiff's allegations of depression, anxiety, and PTSD are supported by the record, as are her reported symptoms of fatigue and avoidance of public spaces. (*Id.* at 110.) Dr. Juriga concluded that Plaintiff was able "to perform unskilled work with limited contact with people." (*Id*.) On August 23, 2019, state agency psychiatric consultant Dr. T. Inman-Dundon reviewed the evidence of record and concurred with Dr. Juriga's conclusions. (*Id*. at 123-24.)

### 2. Hearings Before the ALJ

ALJ McCormack held a telephonic hearing on June 3, 2020, however due to a technical issue most of this hearing was not properly recorded. According to the portion of the transcript that is available, Plaintiff testified that, prior to the COVID-19 pandemic, she attended doctors' appointments three times per week and would get coffee in the morning and walk. (*Id.* at 85.) Plaintiff testified that since the pandemic, her doctors' appointments were over the phone, and she mostly stayed home during the day. (*Id.*) Plaintiff testified that she had no interest in food

but prepared meals "to survive."  (*Id.* at 85-86.)  The transcript is unclear on this point, but

Plaintiff appeared to testify that she would bring supplies to her aunt in Manhattan.  (*Id.*)[4]

The ALJ held another hearing on April 13, 2021.  Plaintiff testified that she worked for

American Airlines as a flight attendant until December 14, 2017 when she was injured.  (*Id.* at

58.)  Plaintiff testified that since the injury, she has suffered physical and psychiatric ailments.

As to the physical ailments, Plaintiff testified that she experiences headaches several times a

week, dizziness, and balance issues, and that in June 2020, she was diagnosed with diabetes.

(*Id.* at 61-62.)  She testified that she relies on a cleaner to help with cleaning her home.  (*Id.* at

62.)  As to the psychiatric ailments, Plaintiff testified to experiencing PTSD, depression, and

anxiety.  (*Id.* at 63-64.)  She testified that she doesn't read anymore, and she struggles to cook

or shop for herself and pay her bills.  (*Id.* at 65.)  She testified to being "very anxious" and

"uncomfortable" in public, and that she has difficulty sleeping and suffers from crying spells.

(*Id.* at 66, 71.)  Plaintiff testified that she easily loses things, and that sometimes when she is in

the middle of a task such as cooking, she will "literally walk to my bedroom and turn off the

lights and go to sleep."  (*Id.* at 66-67.)

Plaintiff testified that she has been taking Prozac since before the workplace injury, and

that she also takes insulin for her diabetes and blood pressure medication.  (*Id.*)  When asked to

describe her daily routine, Plaintiff testified that she spends "a lot of time in the house," and

---

[4]  The transcript reads as follows: "I'm home a lot. And then, after -- I have an aunt, she's like 79 on Riverside in
the city, and since corona, my appointments are down to one, and then, a phone call from the other doctor. So,
it's just, it's very scarce, and I don't have as many appointments.  And I go into the city on Sundays and
Mondays, and take supplies to my lunch, supplies to myself -- that's it, I mean, I stay home, okay, during the
day."  (*Id.* at 85.)

spends much of this time browsing the internet on her cell phone.  (*Id.* at 68-69.)  She testified

that typical chores include grocery shopping and going to doctor appointments.  (*Id.* at 68-69.)

At the hearing, the ALJ presented the vocational expert ("VE") Josiah Pearson with a

hypothetical person of Plaintiff's age, education, and RFC from both before and after the

diabetes diagnosis.  (*Id.* at 72-73).  In response to the hypothetical, the VE identified several

jobs in the national economy that such an individual could perform.  For a person with no

exertional limitations, such jobs included laundry laborer, routing clerk, and mail clerk.  (*Id*. at

74.)  For a person limited to light work, the VE testified that such an individual could perform

the routing clerk and mail clerk positions, as well as garment folder.  (*Id*. at 75.)

### 3.  ALJ's Decision

On June 29, 2021, the ALJ issued an unfavorable decision.  (*Id*. at 13.)  The decision

followed the five-step sequential evaluation process for determining whether an individual is

disabled.  20 C.F.R. § 416.920.  At step one, the ALJ determined that Plaintiff had not engaged

in substantial gainful activity since December 14, 2017.  (*Id.* at 17.)  At step two, he determined

that since December 14, 2017, Plaintiff had the severe impairments of headaches, PCS, PTSD,

major depressive disorder, and ADD.  The ALJ determined that beginning on June 30, 2020,

Plaintiff also had the severe impairment of diabetes.  (*Id.* at 19.)

At step three, the ALJ determined that Plaintiff's impairments did not meet or medically

equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id*. at 20.)

In making this determination, the ALJ specifically considered listings for epilepsy and traumatic

brain injury but determined that the record did not adequately document the frequency of

headaches or related functional limitations required by those listings, and Plaintiff's

neurological exams were mostly normal.  The ALJ also found that Plaintiff's mental impairments were not sufficiently severe to meet or medically equal the criteria of listings 12.04, 12.06, and 12.15.  In making this finding, the ALJ determined that Plaintiff had a mild limitation in understanding, remembering, or applying information, and moderate limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. The ALJ also found that the record did not show marginal adjustment, i.e., a minimal capacity to adapt to changes in her environment or new demands.  Accordingly, Plaintiff did not satisfy the "paragraph B" or "paragraph C" criteria for these listings.

The ALJ then turned to assessing Plaintiff's residual functional capacity ("RFC").[5]  He determined that from December 14, 2017 until June 29, 2020, Plaintiff had the RFC to work at any exertional level at a "low stress" job, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work related decisions; with few, if any, workplace changes; and where there is only occasional interaction with supervisors, coworkers, and/or the general-public, and with the following additional limitations:

- No concentrated exposure to excessive noise, defined as noise in excess of a moderate sound level;
- No exposure to excessive light, defined as jobs requiring protective eye goggles or where there is any exposure to sunlight or stage, strobe, or stadium lights.
- No concentrated exposure to airborne irritants such as fumes, odors, dusts, gases, and/or smoke;
- No requirement to operate motor vehicles or heavy machinery;
- No concentrated exposure to unprotected heights, unprotected machinery, and/or machinery with moving mechanical parts.

---

[5]  The RFC is an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).

The ALJ determined that, following Plaintiff's diabetes diagnosis on June 30, 2020, Plaintiff had the same RFC with the additional exertional limitation of performing only light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b).  (*Id.* at 22, 28-29.)

In making these determinations, the ALJ recognized Plaintiff's symptoms of headaches, panic attacks, anxiety, social anxiety, difficulty falling asleep, fluctuating moods, difficulty concentrating, memory loss, and difficulty with self-care, but found that the record did not show that these symptoms are disabling.  (*Id.* at 23.)  The ALJ noted that Plaintiff testified she is able to cook simple dishes, visit her aunt, drive, manage funds, use the internet, shop, handle her medical care, and dress, bathe, and groom herself.  (*Id.* at 21.)  The ALJ found it particularly noteworthy that Plaintiff can drive because "the ability to drive demonstrates a good degree of concentration and persistence," as well as the ability "to use hand and foot controls," "to turn one's head to consult mirrors, to back up and change lanes, to sit for continuous period of time, and to bend and stoop to get into and out of a car."  (*Id.* at 28.)

The ALJ then determined that the objective medical record supports a finding that Plaintiff is not disabled.  For example, the CT scan of Plaintiff's head taken shortly after the workplace injury showed normal findings, Plaintiff's therapy notes generally showed improvement over time, and Plaintiff's treating providers consistently found her to be pleasant and cooperative with no evidence of thought disorder, hallucinations, or delusions.  (*Id.* at 25.)  Moreover, physical exams generally showed normal range of motion, 5/5 muscle strength, and normal intellectual functioning.

The ALJ then turned to the opinion evidence.  The ALJ found persuasive the opinions of state agency consultant Dr. Juriga that Plaintiff has mild limitations in understanding,

remembering, or applying information; and moderate limitations in interacting with others;

concentrating, persisting, or maintaining pace; and adapting or managing oneself.  He also

found persuasive agency consultant Dr. Saeed's opinion that Plaintiff could perform work at

any exertional level with environmental limitations.  The ALJ noted that these findings were

affirmed on reconsideration by Dr. Inman-Dundon and Dr. Ahmed and were generally

supported by the medical evidence in the record.  (*Id.* at 27.)

  The ALJ also found persuasive Dr. Antiaris' opinion that Plaintiff has no limitations in her

ability to understand, remember, or apply directions and instructions; is moderately limited in

her ability to use reason and judgment to make work-related decisions and interact adequately

with supervisors, coworkers, and the public; and is mildly limited in her ability to sustain

concentration and perform a task at a consistent pace, to sustain an ordinary routine and

regular attendance at work, and to maintain personal hygiene and be aware of normal hazards.

However, the ALJ did not find persuasive Dr. Antiaris' opinion that Plaintiff is markedly limited

in her ability to regulate emotions, control behavior, and maintain well-being.  The ALJ found

that this opinion is not supported by Dr. Antiaris' objective findings and is inconsistent with

treating source evidence showing generally unremarkable mental status exams.  (*Id.* at 28.)

  The ALJ also found unpersuasive Dr. Spooner's opinion that Plaintiff may experience

schedule interruptions secondary to headaches.  The ALJ explained that this opinion "is

speculative, vague and non-specific" and is inconsistent with the rest of the evidence of record,

which is negative for any emergency room visits specifically for headaches.  The ALJ also noted

that Plaintiff does not take medication for her headaches.

The ALJ found unpersuasive Drs. Roufail and Salandanan's opinions that Plaintiff struggled to function at full capacity in core areas of life; that she struggled with memory, recognition, retrieval of visual and verbal information, and adapting to rapidly changing directions and information that require inhibition and disinhibition; and that her ability to track and respond to stimuli over a lengthy period and respond with vigilance and accuracy is compromised. The ALJ found these opinions vague and inconsistent with the generally unremarkable mental status exams. (*Id.* at 27.) He also found the opinion that Plaintiff should refrain from strenuous activities unpersuasive because it is "vague and non-specific." (*Id.*)

The ALJ found that there was no evidence to support any exertional limitation prior to June 30, 2020, in light of Plaintiff's normal physical exams and opinions reflecting no exertional limitation. He explained that limitations in exposure to excessive noise, bright lights and pulmonary irritants were "a common sense application" of limitations for an individual with headaches and PCS. (*Id.* at 28.) The ALJ assigned psychiatric limitations as supported by Dr. Antiaris' mental status exam findings and opinions as well as the agency consultants' opinions. He explained that the limitation of light work was appropriate following Plaintiff's June 30, 2020, diabetes diagnosis. The ALJ noted that Plaintiff testified to "getting her diabetes under control" and she had not been hospitalized for diabetes-related concerns since December 2020.

At step four, the ALJ determined that in light of Plaintiff's RFC, she could not return to her past work as a flight attendant. At step five, based on the VE's testimony, the ALJ found that there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform such as routing clerk and mailing clerk, and accordingly Plaintiff was "not disabled" over the relevant period.

**LEGAL STANDARDS**

A court reviewing a final decision by the Commissioner must, as a threshold matter, determine whether the ALJ provided the plaintiff with a full and fair hearing and fully and completely developed the administrative record. *Intonato v. Colvin*, 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (citation omitted). The duty to develop the record requires the ALJ "to ensure that the record contains sufficient evidence to make a determination." *Bussi v. Barnhart*, 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003). Once satisfied that the plaintiff was afforded a full hearing and the record is fully developed, the court then assesses the Commissioner's conclusions. In doing so, the court is limited to determining whether the conclusions were "supported by substantial evidence in the record," and "based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citation omitted).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available" in the case record. 42 U.S.C. § 423(d)(5)(B). The decision must discuss the evidence and the reasons on which the decision is based. *Id*. § 405(b)(1). It must do so "with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Herrera v. Comm'r of Soc. Sec.*, 2021 WL 4909955, at *5 (S.D.N.Y. Oct. 21, 2021) (citation omitted). That said, the ALJ need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010). If the

Commissioner's findings are supported by substantial evidence, those findings are conclusive. 42 U.S.C. § 405(g); *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

As to the correct legal standard, the Commissioner must conduct a sequential five-step inquiry to determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether she has a "severe impairment" that limits her ability to do basic work activities; (3) if so, whether the impairment is listed in Appendix 1 of the regulations; (4) if the impairment is not so listed, whether the claimant possesses the RFC to perform her past work; and (5) if the claimant cannot perform past work, whether she can perform other work that exists in the national economy. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). The claimant bears the burden of proof at the first four steps of the analysis, and at the last step, the Commissioner has the burden to show there is work the claimant can perform. *Id.*

The Commissioner must also appropriately weigh the medical opinions in accordance with the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the "most important" factors. *Id*. §§ 416.920a, 416.920c(b)(2). The supportability inquiry focuses on how well a medical source supported and explained their opinion. *Samantha R. L. v. Comm'r of Soc. Sec.*, 2023 WL 2424161, at *4 (S.D.N.Y. Mar. 9, 2023) (citations omitted). The question of consistency concerns whether the opinion is consistent with other evidence in the medical record. *Id.* In evaluating the medical evidence, the Commissioner need not assign particular evidentiary weight to treating physicians as was previously required by the Act, but the regulations continue to recognize the "foundational nature" of the observations of treating sources. *Id.* at *5.

22

## DISCUSSION

As an initial matter, I find that the ALJ provided Plaintiff with a full and fair hearing under the Secretary's regulations and completely developed the administrative record. Accordingly, I turn to Plaintiff's arguments in support of remand. Plaintiff asserts three arguments in support of remand, all of which challenge the ALJ's RFC determination. In sum, Plaintiff argues that the RFC failed to fully account for Plaintiff's (1) physical limitations, (2) psychological/psychiatric limitations, and (3) mental/cognitive limitations. I consider each argument in turn.

### 1. The RFC Properly Accounted for Plaintiff's Physical Limitations

An RFC assessment must address the claimant's "remaining exertional and nonexertional capacities." Social Security Ruling ("SSR") 96-8P. Exertional capacity addresses an individual's limitations of physical strength and defines the individual's abilities to perform the "seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* In assessing Plaintiff's exertional capacities, the ALJ determined that Plaintiff had no exertional limitations for the period prior to the diabetes diagnosis, and that she was limited to "light work" following her diabetes diagnosis on June 30, 2020.[6] Plaintiff argues remand is warranted because the ALJ's analysis did not properly assess her "capacity to perform physical functions in order to decide which exertional level is appropriate." (Joint Stip. 10-12.) This argument is without merit.

---

[6] "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and includes work that "requires a good deal of walking or standing," or "some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567

As to the period prior to June 30, 2020, the ALJ explained that there was virtually no medical evidence supporting any exertional limitation.  Plaintiff's doctors generally reported normal physical ability, including consistent findings of normal range of motion, 5/5 muscle strength, normal gait and station, and normal sensation to pain, light touch, proprioception, and vibration.  The ALJ also reasonably relied on the assessments of agency consultants, Drs. Saeed and Inman-Dundon, that Plaintiff could perform work at "any exertional level" with certain environmental limitations.  The ALJ found these opinions to be internally supported and consistent with the objective evidence in the record showing normal physical findings.  These opinions were also consistent with that of neurologic examiner, Dr. Spooner, who found no physical limitations.  This constitutes substantial evidence on which to base the ALJ's finding of no physical limitations for this period.  The ALJ incorporated all recommended environmental limitations in Plaintiff's RFC to account for symptoms such as headaches, dizziness, and balance issues, including limitations regarding exposure to noise, light, and heights, and requirements to operate motor vehicles or heavy machinery.

The only medical opinion in the record indicating a physical limitation prior to June 30, 2020, was that of Dr. Abramov, who generally advised that Plaintiff refrain from strenuous activities.  The ALJ reasonably found that this opinion was "vague and non-specific," because it did not define "strenuous activity."  *Decresce v. Colvin*, 2015 WL 5918316, at *4 (N.D.N.Y. Oct. 9, 2015) (recommendation that plaintiff avoid strenuous activity was vague where the physician did not define "strenuous activity").  The ALJ observed that this opinion was inconsistent with the evidence showing normal physical exams and was unsupported by Dr. Abramov's own

findings as to Plaintiff's normal range of motion and manual muscle strength.  The ALJ thus did not err in according this opinion no weight.

As to the period following June 30, 2020, the ALJ explained that in light of Plaintiff's diabetes diagnosis, the exertional limitation of light work was appropriate.  The ALJ noted that Plaintiff was hospitalized due to complications with her as-yet undiagnosed diabetes, but that Plaintiff was discharged shortly thereafter with "normal physical exams," and all of Plaintiff's physical exams following that visit were normal.  The ALJ also noted that Plaintiff testified to having her diabetes largely under control due to diet and exercise.  Plaintiff also testified at the hearing that her physical ailments were limited to headaches, dizziness, and balance issues, and that she performed floor exercises every day.

Notably, there is no medical opinion as to what exertional capacity is appropriate for Plaintiff following her diabetes diagnosis.  However, because an RFC finding "is administrative in nature, not medical," *Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48 n.3 (2d Cir. 2021), an ALJ can make an RFC determination without a supporting medical opinion, provided the RFC is otherwise supported by the record, *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109-10 (2d Cir. 2020); *see also Corbiere v. Berryhill*, 760 F. App'x 54, 56 (2d Cir. 2019) (affirming the RFC, notwithstanding that there was no corresponding medical opinion, where treatment notes supported the limitations).  Accordingly, the ALJ's determination as to Plaintiff's physical capabilities following the diabetes diagnosis was based on substantial evidence and he followed the correct legal standard in reaching his conclusions.

Plaintiff's argument to the contrary is particularly unpersuasive because she has not provided any specifics as to how, if it all, she is more physically limited than what the RFC

provides.  It is Plaintiff's burden to prove her RFC is more restricted than that found by the ALJ,

*McIntyre*, 758 F.3d at 150, but Plaintiff has not suggested that she has any limitations related to

sitting, standing, walking, lifting, carrying, pushing, or pulling.  Rather, Plaintiff simply provides a

list of her diagnoses, medications, and treatments without stating why these factors warrant

additional exertional limitation.  In assessing disability, "the operative question is not what

illness or condition is present; it is the limitations, if any, such a condition has upon the

claimant's functional abilities."  *Ezequiel M. v. Comm'r of Soc. Sec.*, 2022 WL 17094161, at *14

(W.D.N.Y. Nov. 21, 2022) (citing 20 C.F.R. § 416.921).  Plaintiff has not indicated what physical

limitations she experiences that would require a different outcome were this case remanded

and accordingly has not met her burden.

### 2.  The RFC Accounts for Plaintiff's Psychological/Psychiatric Limitations.

Plaintiff argues remand is warranted because the RFC does not fully account for "all

supported limitations" such as difficulty sleeping, loss of appetite, depression, fatigue, feelings

of worthlessness, concentration difficulties, and social withdrawal.  (Joint Stip. 14-15.)  Plaintiff

also notes that Dr. Antiaris opined that Plaintiff has marked limitations in her abilities to

regulate emotions, control behavior, and maintain well-being, and mild limitations in her ability

to maintain personal hygiene and be aware of normal hazards.  Plaintiff argues that the ALJ

failed to account for how these psychological and psychiatric symptoms impact her "ability to

function on a daily basis."  (*Id.* at 15.)  This argument is also without merit.

In assessing Plaintiff's RFC, the ALJ acknowledged the existence of Plaintiff's psychiatric

conditions and their related symptoms.  However, relying on the medical record, the ALJ found

that the symptoms were not so severe as to be disabling.  For example, although Plaintiff

reported fatigue and difficulties concentrating, the ALJ noted that Plaintiff could follow instructions, go to doctor's appointments, shop, drive, manage funds, use the internet, and handle her own medical care.  Similarly, although Plaintiff reported social withdrawal, she also testified to visiting her aging aunt and doing grocery shopping with assistance, and she was always cooperative and pleasant with her doctors.  The medical records consistently show that Plaintiff had no symptoms of hallucinations, delusions, disordered thinking, or paranoia, and that she displayed fair judgment and insight, and was alert and oriented.  Notably, Plaintiff's conditions of anxiety and ADD were present before the alleged onset date, and these conditions did not previously interfere with Plaintiff's ability to work.

Additionally, the ALJ acknowledged Dr. Antiaris' opinion that Plaintiff is markedly limited in her ability to regulate emotions, control behavior, and maintain well-being.  The ALJ did not err in assigning this opinion no weight in light of the fact that this opinion was not supported by Dr. Antiaris' own findings that Plaintiff was cooperative and related adequately, had clear sensorium, and exhibited "coherent and goal directed" thought processes, and was inconsistent with treating source evidence showing unremarkable mental status exams and medical opinion evidence assessing only moderate limitations in Plaintiff's abilities to interact with the public and maintain socially appropriate behavior.  *See Boffoli v. Comm'r of Soc. Sec.*, 2022 WL 973754, at *9 (S.D.N.Y. Mar. 31, 2022) (ALJ did not err in declining to grant great weight to medical source opinion of a marked limitation in ability to regulate emotions, control behavior, and maintain well-being because there was a "[g]enuine conflict[]" in the medical evidence and "the deferential standard of review prevents us from reweighing it.")

In any event, Plaintiff's RFC accounts for her psychiatric limitations because it limits Plaintiff to work that is low stress with few, if any, workplace changes and where there is only occasional interaction with supervisors, coworkers, and the general public.  *See Platt v. Comm'r of Soc. Sec.*, 588 F. Supp. 3d 412, 421 (S.D.N.Y. 2022) (RFC determination that plaintiff was limited "to only occasional and superficial interaction with the general public and coworkers" was sufficient to account for moderate limitations interacting with others).  The ALJ accounted for Plaintiff's ability to deal with "normal hazards" by limiting Plaintiff to jobs where there is no requirement to operate motor vehicles or heavy machinery and no concentrated exposure to unprotected heights, unprotected machinery, and machinery with moving mechanical parts.

Accordingly, ALJ McCormack's conclusions were supported by substantial evidence and were based on the correct legal standard.  Plaintiff has not suggested what other changes to the RFC would be needed in light of her limitations or pointed to any evidence in the record that the ALJ overlooked or failed to explain, and thus has not met her burden to show that a more restrictive RFC determination was warranted.

### 3. The RFC Accounts for Plaintiff's Mental/Cognitive Limitations.

Plaintiff argues that she "does not have the mental residual functional capacity to perform competitive remunerative unskilled work" because she has difficulties with cognitive functioning, including expressive and receptive language, executive functioning, distractibility, sensorium, and short-term memory.  (Joint Stip. 18.)

Plaintiff cites to SSR 85-15 for what requirements a claimant must be able to do on a sustained basis to perform "unskilled work," and seems to argue that the ALJ erred in his application of SSR 85-15 by failing to make an independent determination of whether Plaintiff

could perform unskilled work.  However, SSR 85-15 is inapplicable here, as that SSR addresses

situations where the ALJ employs the Medical-Vocational Guidelines, at 20 C.F.R. Pt. 404,

Subpt. P, App'x 2 (the "Grids") to make a final determination on disability.  Here, the ALJ did not

rely on the Grids, which only apply to cases where a claimant has no non-exertional

impairments.  In such cases, the ALJ must consider whether the claimant meets the demands

required to perform unskilled work listed in SSR 85-15.  However, in cases such as the one at

hand, the ALJ instead may rely on the testimony of a VE as to what work a plaintiff can do.

*Zabala*, 595 F.3d at 411.  Accordingly, Plaintiff's argument that the ALJ failed to consider

whether she could perform unskilled work as defined in SSR 85-15 is misplaced.

That said, setting aside Plaintiff's citation to SSR 85-15, the thrust of Plaintiff's argument

seems to be that the ALJ erred by failing to consider Plaintiff's cognitive limitations in

determining the RFC.  This argument also lacks merit because the ALJ's RFC determination fully

considered Plaintiff's mental and cognitive limitations.  The ALJ recognized Plaintiff's cognitive

struggles and assessed mild limitations in understanding, remembering, or applying

information, and moderate limitations in concentrating, persisting, or maintaining pace.  These

assessments were based on substantial evidence, including findings by numerous examining

physicians that Plaintiff had no cognitive impairments and was of average intelligence.  Indeed,

Dr. Antiaris found that Plaintiff showed coherent and goal-directed thought processes, was able

to complete counting and simple calculations correctly, had "average cognitive functioning,"

and showed "fair" insight and judgment.  Similarly, Dr. Radna found that Plaintiff was "negative

for any cognitive deficits," Dr. Abramov found that Plaintiff was neurologically "intact," and Dr.

Head found no impairment of concentration or comprehension and no sign of brain injury.  (*Id.* at 611-12, 703-04, 847.)

While the ALJ noted and discussed Plaintiff's ongoing treatment with Behavioral Medicine Associates for cognitive functioning issues, he also noted that Behavioral Medicine Associates treatment records showed that Plaintiff had average intellectual functioning, and her concentration, immediate memory, and crystallized intelligence were intact.  To the extent the Behavioral Medicine Associates physicians opined that Plaintiff was struggling with certain cognitive processes, the ALJ reasonably found these opinions vague and unhelpful because they did not provide a function-by-function analysis of Plaintiff's limitations, and that these opinions were inconsistent with the record.  Thus, the ALJ did not err in weighing the medical opinions.

The ALJ also appropriately included limitations in Plaintiff's RFC to account for her cognitive struggles, including limiting Plaintiff to "low stress" work, which is defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work-related decisions, with few, if any, workplace changes; and where there is only occasional interaction with supervisors, coworkers, or the general public.  The jobs identified by the VE that Plaintiff can perform are all "unskilled" positions that are compatible with moderate cognitive limitations.  *See, e.g.*, *Zabala*, 595 F.3d at 410 (moderate limitation in the area of concentration, persistence, or pace does not necessarily preclude the ability to perform unskilled work); *Morales v. Berryhill*, 484 F. Supp. 3d 130, 150 (S.D.N.Y. 2020) (moderate impairments in ability to understand, remember, and carry out detailed instructions consistent with ability to perform unskilled work).

Accordingly, Plaintiff has not met her burden to show that remand is warranted.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is DENIED

and Defendant's motion for judgment on the pleadings is GRANTED.

**The Clerk of the Court is respectfully directed to terminate the joint motion at ECF No. 15,**

**enter a final judgment in favor of the Commissioner, and close the case.**

**SO ORDERED.**

Dated: August 7, 2023
     New York, NY
                              KATHARINE H. PARKER
                              United States Magistrate Judge